UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| INDIANA AUTOBODY ASSOCIATION, INC., | ) |
| GARY CONNS COLLISION CENTER, INC., | ) |
| CROSS PAINT & BODY SHOP, | ) |
| INCORPORATED, DAN T. GRATZ BODY SHOP, | ) |
| INC., DECKER & VICKERY, INC., ENNEKING'S | ) |
| AUTO BODY, INC., EXCEL AUTO BODY, INC., | ) |
| JON'S BODY SHOP, INC., MAIN STREET BODY | ) |
| SHOP, INC., MINTON BODY SHOP, INC., | ) |
| PRESTIGE AUTO BODY REPAIR, INC., KEVIN | ) |
| WELLS, dba KNJ LLC and QUALITY | ) |
| COLLISION, INC., SOUTHLAKE COLLISION | ) |
| CENTER, INC., TEAM 150, INC., and Carl | ) |
| THURMAN dba THURMAN BODY SHOP, LLC, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| -vs- | ) CASE NO:  1:14-cv-507 |
| | ) |
| STATE FARM MUTUAL AUTOMOBILE | ) |
| INSURANCE COMPANY, STATE FARM | ) |
| FIRE AND CASUALTY COMPANY, STATE | ) |
| FARM GENERAL INSURANCE COMPANY, | ) |
| PROGRESSIVE CASUALTY INSURANCE | ) |
| COMPANY, PROGRESSIVE AMERICAN | ) |
| INSURANCE COMPANY, PROGRESSIVE | ) |
| CLASSIC INSURANCE COMPANY, | ) |
| PROGRESSIVE DIRECT INSURANCE | ) |
| COMPANY, PROGRESSIVE MAX INSURANCE | ) |
| COMPANY, INDIANA FARMERS MUTUAL | ) |
| INSURANCE COMPANY, ALLSTATE | ) |
| INDEMNITY COMPANY, ALLSTATE | ) |
| INSURANCE  COMPANY, ALLSTATE | ) |
| PROPERTY AND CASUALTY INSURANCE | ) |
| COMPANY, ALLSTATE VEHICLE AND | ) |
| PROPERTY INSURANCE COMPANY, GEICO | ) |
| GENERAL INSURANCE COMPANY, GEICO | ) |
| INDEMNITY COMPANY, SHELTER GENERAL | ) |
| INSURANCE COMPANY, SHELTER MUTUAL | ) |
| INSURANCE COMPANY, NATIONWIDE | ) |
| MUTUAL INSURANCE COMPANY, | ) |
| NATIONWIDE PROPERTY AND  CASUALTY | ) |
| INSURANCE  COMPANY, NATIONWIDE | ) |

ASSURANCE COMPANY, AMERICAN FAMILY    )
MUTUAL INSURANCE COMPANY, ERIE         )
INSURANCE COMPANY, ERIE INSURANCE      )
PROPERTY & CASUALTY COMPANY,           )
AUTO-OWNERS INSURANCE COMPANY,         )
ZURICH AMERICAN INSURANCE COMPANY,     )
ZURICH AMERICAN INSURANCE COMPANY      )
OF ILLINOIS, and LIBERTY MUTUAL        )
INSURANCE COMPANY,                     )
                                       )
                    Defendants.        )  Jury Trial Requested

## COMPLAINT

### Introduction

1.      This is an action for injunctive relief and damages brought by multiple Indiana body shops against multiple insurance companies.  The body shops ("Shops") protect and provide services to consumers by repairing damaged vehicles so that they are safe to operate on public roads, and so they may protect the general public should those vehicles be involved in another collision.  The insurance companies ("Insurers") are improperly intruding upon the relationship between the Shops and consumers, and placing the driving public at harm by their practices.

### Jurisdiction, Venue and Cause of Action

2.      This Court has original subject matter jurisdiction of the federal questions presented herein pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court has supplemental jurisdiction of the state law claims presented pursuant to 28 U.S.C. § 1367(a), because the state and federal claims "derive from a common nucleus of operative fact."  *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966).

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), for some of the Defendants reside in this judicial district, and the events or omissions giving rise to these claims arose here.

4.      This is an action brought pursuant to the right of action recognized by the Sherman Antitrust Act of 1890, 15 U.S.C. § 1 et seq., as amended, and by the laws of the State of Indiana.

**Parties**

5.      Plaintiff Indiana AutoBody Association, Inc. ("IABA"), is a non-profit domestic corporation, incorporated and existing in the State of Indiana.  IABA is a trade organization that represents businesses engaged in collision repair of automobiles statewide; promotes professionalism; and promotes consumer awareness of the automotive collision repair industry in the State of Indiana.

6.      Plaintiff Gary Conns Collision Center, Inc., is a business incorporated and operating in the State of Indiana, engaged in the collision repair of automobiles.

7.      Plaintiff Cross Paint & Body Shop, Inc., is a business incorporated and operating in the State of Indiana, engaged in the collision repair of automobiles.

8.      Plaintiff Dan T. Gratz Body & Paint Shop, Inc., is a business incorporated and operating in the State of Indiana, engaged in the collision repair of automobiles.

9.      Decker & Vickory Inc., is a business incorporated and operating in the State of Indiana, engaged in the collision repair of automobiles.

10.      Plaintiff Enneking Auto Body, Inc., is a business incorporated and operating in the State of Indiana, engaged in the collision repair of automobiles.

11.     Plaintiff Excel Auto Body & Glass, Inc., is a business incorporated and operating in the State of Indiana, engaged in the collision repair of automobiles.

12.     Plaintiff Jon's Body Shop, Inc., is a business incorporated and operating in the State of Indiana, engaged in the collision repair of automobiles.

13.     Main Street Body Shop, Inc., is a business incorporated and operating in the State of Indiana, engaged in the collision repair of automobiles.

14.     Plaintiff Minton Body Shop, Inc., is a business incorporated and operating in the State of Indiana, engaged in the collision repair of automobiles.

15.     Plaintiff Prestige Auto Body Repair, Inc., is a business incorporated and operating in the State of Indiana, engaged in the collision repair of automobiles.

16.     Plaintiff Kevin Wells, d/b/a KNJ LLC and Quality Collision, Inc., is a business operating in the State of Indiana, engaged in the collision repair of automobiles.

17.     Plaintiff Southlake Collision Center, Inc., is a business incorporated and operating in the State of Indiana, engaged in the collision repair of automobiles.

18.     Plaintiff Team 150, Inc., is a business incorporated and operating in the State of Indiana, engaged in the collision repair of automobiles.

19.     Plaintiff Carl Thurman, d/b/a, Thurman Body Shop, LLC, is a business operating in the State of Indiana, engaged in the collision repair of automobiles.

20.     Defendant State Farm Mutual Automobile Insurance Company is an insurance company, pursuant to Indiana Code § 27-1-2-3, registered with the Indiana Department of Insurance ("IDOI"), to do business within the State of Indiana.

21.     Defendant State Farm Fire and Casualty Company is an insurance company, pursuant to I.C. § 27-1-2-3, registered with the IDOI to do business within the State of Indiana.

22.     Defendant State Farm General Insurance Company is an insurance company, pursuant to I.C. § 27-1-2-3, registered with the IDOI to do business within the State of Indiana.  (State Farm Mutual Automobile Insurance Company, State Farm Fire and Casualty Company and State Farm General Insurance Company are hereinafter collectively referred to as "State Farm").

23.     Defendant Progressive Casualty Insurance Company is an insurance company, pursuant to I.C. § 27-1-2-3, registered with the IDOI to do business within the State of Indiana.

24.     Defendant Progressive American Insurance Company is an insurance company, pursuant to I.C. § 27-1-2-3, registered with the IDOI to do business within the State of Indiana.

25.     Defendant Progressive Classic Insurance Company is an insurance company, pursuant to I.C. § 27-1-2-3, registered with the IDOI to do business within the State of Indiana.

26.     Defendant Progressive Direct Insurance Company is an insurance company, pursuant to I.C. § 27-1-2-3, registered with the IDOI to do business within the State of Indiana.

27.     Defendant Progressive Max Insurance Company is an insurance company, pursuant to I.C. § 27-1-2-3, registered with the IDOI to do business within the State of Indiana.  (Progressive Casualty Insurance Company, Progressive American Insurance

Company, Progressive Classic Insurance Company, Progressive Direct Insurance Company and Progressive Max Insurance Company are hereinafter collectively referred to as "Progressive.")

28.     Defendant Indiana Farmers Mutual Insurance Company is an insurance company, pursuant to I.C. § 27-1-2-3, registered with the IDOI to do business within the State of Indiana.

29.     Defendant Allstate Indemnity Company is an insurance company, pursuant to I.C. § 27-1-2-3, registered with the IDOI to do business within the State of Indiana.

30.     Defendant Allstate Insurance Company is an insurance company, pursuant to I.C. § 27-1-2-3, registered with the IDOI to do business within the State of Indiana.

31.     Defendant Allstate Property and Casualty Insurance Company is an insurance company, pursuant to I.C. § 27-1-2-3, registered with the IDOI to do business within the State of Indiana.

32.     Defendant Allstate Vehicle and Property Insurance Company is an insurance company, pursuant to I.C. § 27-1-2-3, registered with the IDOI to do business within the State of Indiana.

33.     Defendant GEICO General Insurance Company is an insurance company, pursuant to I.C. § 27-1-2-3, registered with the IDOI to do business within the State of Indiana.

34.     Defendant GEICO Indemnity Company is an insurance company, pursuant to I.C. § 27-1-2-3, registered with the IDOI to do business within the State of Indiana.

35.     Defendant Shelter General Insurance Company is an insurance company, pursuant to I.C. § 27-1-2-3, registered with the IDOI to do business within the State of Indiana.

36.     Defendant Shelter Mutual Insurance Company is an insurance company, pursuant to I.C. § 27-1-2-3, registered with the IDOI to do business within the State of Indiana.

37.     Defendant Nationwide Mutual Insurance Company is an insurance company, pursuant to I.C. § 27-1-2-3, registered with the IDOI to do business within the State of Indiana.

38.     Defendant Nationwide Property and Casualty Insurance Company is an insurance company, pursuant to I.C. § 27-1-2-3, registered with the IDOI to do business within the State of Indiana.

39.     Defendant Nationwide Assurance Company is an insurance company, pursuant to I.C. § 27-1-2-3, registered with the IDOI to do business within the State of Indiana.

40.     Defendant American Family Mutual Insurance Company is an insurance company, pursuant to I.C. § 27-1-2-3, registered with the IDOI to do business within the State of Indiana.

41.     Defendant Erie Insurance Company is an insurance company, pursuant to I.C. § 27-1-2-3, registered with the IDOI to do business within the State of Indiana.

42.     Defendant Erie Insurance Property & Casualty Company is an insurance company, pursuant to I.C. § 27-1-2-3, registered with the IDOI to do business within the State of Indiana.

43.     Defendant Auto-Owners Insurance Company is an insurance company, pursuant to I.C. § 27-1-2-3, registered with the IDOI to do business within the State of Indiana.

44.     Defendant Zurich American Insurance Company is an insurance company, pursuant to I.C. § 27-1-2-3, registered with the IDOI to do business within the State of Indiana.

45.     Defendant Zurich American Insurance Company of Illinois is an insurance company, pursuant to I.C. § 27-1-2-3, registered with the IDOI to do business within the State of Indiana.

46.     Defendant Liberty Mutual Insurance Company is an insurance company, pursuant to I.C. § 27-1-2-3, registered with the IDOI to do business within the State of Indiana.

## Factual Allegations

47.     Each individual Plaintiff except for the IABA (also collectively referred to as the "Shops"), is in the business of recovery and repair of motor vehicles involved in collisions.

48.     The IABA is a non-profit association, of which the Shops and other body shops are members, that seeks to protect the interests of its members in their business relationships with insurers, promote professionalism and consumer awareness of the automotive collision industry.

49.     Each individual Defendant is an insurer providing automobile policies to consumers throughout the state of Indiana.

50.     Each Plaintiff has done business at various times over the course of years

with Defendants' policyholders and claimants by providing to them motor vehicle collision repair services. Defendant Insurers are generally individually responsible for payment of those repairs for their respective policyholders and claimants, pursuant to insurance agreements between the Defendants, on one side, and the policyholders and claimants on the other.

51. Upon information and belief, over the course of several years, the Defendants have engaged in an ongoing, concerted and intentional course of action and conduct with State Farm spearheading efforts to control and artificially depress automobile damage repair costs to the detriment of the Plaintiffs, policyholders, claimants and consumers, but to the substantial advantage of the Defendants.

52. One method by which the Defendants exert control over Plaintiffs' businesses is by entering "program agreements" with individual Plaintiffs and other body shops that are similarly situated. Although each Defendant's program agreements have unique titles, such agreements are known generally and generically within the collision repair industry as Direct Repair Program agreements ("DRPs").

53. DRPs were presented and characterized by the Defendants to the Plaintiffs as a mutually beneficial opportunity. In exchange for providing certain concessions of price, priority and similar matters, the individual Defendant would list the body shop as a "preferred provider."

54. However, the concessions demanded by the Insurers in exchange for remaining on the Direct Repair Program were not balanced by the purported benefits. The Defendants, particularly State Farm, have utilized these agreements to exert control over the Shops in a variety of manners, and well beyond the constraints imposed by an

ordinary business agreement.

55.     Upon information and belief, Defendants, particularly State Farm, have

engaged in an ongoing pattern and practice of coercion and implied threats to the

pecuniary health of the individual Plaintiff's businesses in order to force compliance with

unreasonable and onerous concessions.  Failure to comply by a Shop results in either

removal from the DRP, combined with improper "steering" of customers away from the

Plaintiff's business, or simply punishment to decrease the number of customers utilizing

the Plaintiff's services.

56.     According to the Company Market Share Report, as of May 21, 2013,

State Farm has captured 24.98% of the private passenger automobile insurance business

within the market area of the state of Indiana.  (*See Indiana 2012 Market Share Report*, p.

1, attached hereto as Exhibit 1).  The market share for its closest competitor, Progressive

is 9.81%.  (*Id.*)  The next closest competitor, Indiana Farm Bureau Group (which appears

to be coterminous with Indiana Farmers Mutual Insurance Company), holds less than a

third of the market share of State Farm, 7.98%.  (*Id.*)

57.     Based upon the foregoing, State Farm holds an unchallenged and clearly

dominant position within the automobile insurance industry in the Indiana market.

58.     Collectively, upon information and belief, the Defendants control over

75% of the market within the State of Indiana.  (*Id.*)

59.     Upon information and belief, the vast majority of the Plaintiffs' business is

generated by customers for whom the Defendants are responsible to pay repair costs.

60.     Customers with insurance account for between seventy and ninety-five

percent of each shop's revenue.  Courts have acknowledged the significant role played by

insurance companies in funding automobile collision repairs, as well as the ability and

market power to exert substantial influence and control over where its customer will take

a wrecked car for repairs. *See*, e.g., *Allstate Ins. Co. v. Abbott*, 2006 U.S. Dist. LEXIS

9342 (N.D. Tex. 2006) (aff'd, *Allstate Ins. Co. v. Abbott*, 495 F.3d 151 (5th Cir. 2007).

61.     Generally, each DRP usually contains a statement to the effect that the

body shop will charge the respective insurance company no more for any particular repair

than the going rate in the market area (also referred to as the "Market Rate").

62.     In order to establish the Market Rate, State Farm utilizes what it terms

"surveys."  The geographical boundaries of the market area to be surveyed to establish

the Market Rate are wholly within the control and direction of State Farm.

63.     Under the terms of its DRP, State Farm is not required to disclose any of

the methods by which it establishes either the market area, the Market Rate, or any other

factual bases for its determination of the Market Rate.  The agreement contains no

provisions for independent and neutral verification of the data utilized, nor any

meaningful oversight not directly within the control and direction of State Farm.  The

Shops are simply required to blindly accept State Farm's pronouncements regarding these

matters.

64.     State Farm Surveys were previously conducted by sending written

documents to individual body shops.  The owner or designated representative of the shop

would fill out the survey and return it to State Farm.  Recently, this process has been

transferred to an electronic forum, State Farm's Business-to-Business portal, whereby the

shops go online to complete the survey.

65.     State Farm does not perform a survey that has any scientific validity,

whereby information is obtained and results produced that establish an accurate baseline of all the shops' information.  With respect to labor rates, for example, State Farm's methodology does not represent what the majority of shops in a given area charge. Instead, State Farm's methodology lists the shops in a given market (as determined by State Farm) with the highest rates at the top of the list and descending to the least expensive hourly rates at the bottom.

66.     State Farm then lists how many technicians a shop employs or the number of work bays available, whichever is lesser. Those are totaled and State Farm employs its "50% plus one" method.  If, for example, a State-Farm-determined market area has a total of fifty (50) technicians or work bays, State Farm's "50% plus one" formula equals twenty-six (26).  With that number, starting at the bottom of the shop list, State Farm counts each shop's technicians until the "half plus one" number is reached, twenty six, and whatever that shop's rate happens to be is declared the market rate.

67.     There might be some validity to this method if it accounted for the variance in shop size, but it does not. However, the greatest problem with this method is that State Farm can and does unilaterally and wrongalter the labor rates that are submitted by the shops, decreasing those arbitrarily deemed too high, or higher than State Farm wishes to pay.

68.     By altering the rates entered, particularly those of the larger shops, with the most technicians and/or work bays, State Farm manipulates the results to achieve a wholly artificial Market Rate.  The results are therefore not that of a scientific survey that reflects the designated market area but instead are created from whole cloth by State Farm.

69.     Furthermore, State Farm attempts to prohibit the shops from discussing with each other the information each has entered into the survey, asserting any discussion may constitute illegal price-fixing.

70.     State Farm selects the geographical boundaries of the survey, and State Farm retains the right to alter the survey results and does so without disclosure or oversight.

71.     Another electronic page on State Farm's business portal is known as the Dashboard.

72.     The Dashboard has multiple functions and effects.  It serves as the record of an individual shop's survey responses.  It also provides a "report card" and rating of the individual shop based primarily upon three criteria: quality, efficiency and competitiveness.

73.     Within the quality criterion, the shop's reported customer satisfaction, customer complaints, and quality issues identified by an audit are scored.

74.     The efficiency criterion evaluates repair-cycle time, number of days a vehicle is in the shop, utilizing information input by the shops on the car's drop-off and pick-up dates.

75.     The competitiveness criterion analyzes the average estimate for each State Farm repair, the cost of parts, whether a vehicle is repaired or replacement parts are utilized, the number of hours required to complete repair and similar matters.

76.     In rating an individual shop, a total score of 1000 is possible.  However, State Farm is under no obligation to disclose the weight or total number of points possible given to each factor included in reaching the score, particularly those factors

included under the competitiveness criterion. To date, State Farm has refused to disclose its method of determining competitiveness to the Shops, and even, upon information and belief, to its own team leaders.

77. Due to these opaque practices, State Farm maintains complete, unsupervised, and unreviewable authority to determine an individual shop's rating. It is therefore possible for a shop to have no customer complaints, high customer satisfaction, no issues identified on an audit, complete compliance with all repair cycle time and inefficiency requirements and yet still have a low rating. It is also possible for a shop to have multiple customer complaints, poor customer satisfaction, numerous issues identified on audit and complete failure to meet efficiency expectations and yet have a very high rating.

78. The Dashboard rating is very important as a shop's rating determines its position on the list of preferred providers. When a consumer logs on to the State Farm web site seeking a repair shop, those shops with the highest ratings are displayed first. A shop with a low rating will be at the bottom of the list, often pages and pages down, making it difficult for a potential customer to find it. If a customer calls State Farm, the representative provides the preferred shops beginning with those holding the highest rating.

### Suppression of Labor Rates

79. Among the questions asked by the survey is the individual shop's hourly labor rate. This information is supposed to be provided by the shop and to accurately reflect that shop's labor rate to allow State Farm to reach a market average. State Farm's actual method of determining a "market rate" is described above.

80.    If State Farm unilaterally deems the labor rate information unacceptable, a State Farm representative will contact the shop and demand the labor rate be lowered to an amount State Farm wishes to pay.

81.    If the body shop advises a labor rate increase is required, State Farm representatives will inform the body shop they are the only shop in the area that has raised its rates and therefore the higher rate does not conform with the "market rate" and is thus a violation of the DRP agreement.

82.    At various points in time, State Farm has utilized this method of depressing labor rates, falsely telling each shop they are the only one to demand a higher labor rate when, in fact, State Farm knew multiple shops had attempted to raise their labor rates and advised State Farm of such.

83.    Should a shop persist in its efforts to raise its labor rate, State Farm will take one or more of several "corrective" measures:  it will go into the individual shop's survey responses and unilaterally and wrongfully alter the labor rate listed without the knowledge or consent of the shop and use this lowered rate to justify its determination of the "market rate."  It will threaten to remove the shop from the Direct Repair Program to coerce compliance.  It will also remove the shop from the Direct Repair Program.

84.    The net effect of this tactic is to allow State Farm to manipulate the "market rate" and artificially suppress the labor rate for the relevant geographic area, which is defined solely by State Farm and is not subject to either neutral verification or even disclosure.

85.    Upon information and belief, the remaining Defendants, intentionally and by agreement and/or conscious parallel behavior, specifically advised the Plaintiffs they

will pay no more than State Farm pays for labor. These Defendants have not conducted any surveys of their own in which the Plaintiffs have participated to determine market rates. They have agreed to join forces with State Farm, the dominant market holder, and each other to coerce the Plaintiffs into accepting the artificially created less-than-market labor rates through intimidation and threats to the Plaintiffs' financial ability to remain operational and viable.

Suppression of Repair and Material Costs

86.     Through various methods, the Defendants have, independently and in concert, instituted numerous methods of coercing the Plaintiffs into accepting less than actual and/or market costs for materials and supplies expended in completing repairs.

87.     Some of these methods include but are not limited to: refusal to compensate the shops for replacement parts when repair is possible though strongly not recommended based upon the shop's professional opinion; utilizing used and or recycled parts rather than new parts, even when new parts are available and a new part would be the best and highest quality repair to the vehicle; requiring discounts and/or concessions be provided, even when doing so requires the shop to operate at a loss; and de facto compulsory utilization of parts procurement programs.

88.     In addition to the above, the Defendants have repeatedly and intentionally failed to abide by industry standards for auto repairs. Three leading collision repair estimating databases are in ordinary usage within the auto body collision repair industry:

(a) ADP;

(b) CCC; and

(c) Mitchell.

89.     These databases provide software and average costs associated with particularized types of repairs to create estimates.  The estimates generated by these databases include the ordinary and customary repairs, repair time (labor) and materials necessary to return a vehicle to its pre-accident condition.  These databases and the estimates they generate are accepted within the industry as authoritative, barring unusual or exceptional circumstances.

90.     Over the course of years, the Defendants have admitted the authoritative position of the estimating databases within the industry, but have nonetheless engaged in a course of conduct of refusing to make the full payment for procedures and materials.  In many instances the Defendants will refuse to allow the body shop to perform required procedures and processes, thereby requiring the Plaintiffs to perform less than quality work or suffer a financial loss.

91.     The Defendants refuse to pay and/or pay in full for a large number of procedures and processes that are required to be performed by the Shops to return the vehicles of their insured and/or claimants to their pre-collision state.

92.     At the same time, Defendants selectively rely upon and assert the definitive nature of these databases when doing so is to their respective financial advantage.  For example, when a particular repair requires twenty hours of labor to complete but the database estimate notes fifteen hours of labor is standard for that type of repair, Defendant will cite the database estimate and pay for only fifteen hours of labor time.

93.     With respect to some materials that must be expended to repair automobile collisions, Defendants simply refuse to pay for them, asserting materials are part of the

cost of doing business. This is the Defendants' position even when the authoritative databases specifically state that such materials are not included in the repair procedure pages.

94.     The only partial exception to the foregoing practice is paint. While paint costs are factored into the amount the Defendants will pay, they are calculated via a formula that compensates the shops for only half the actual cost on average.  The Defendants' method of calculating paint payment does not take into account the type of paint needed/used, the requirement that paint be mixed to match the existing color of the vehicle, the actual amount of paint required to complete the job, the type of vehicle involved or any other factor.

95.     This continued refusal and/or failure to compensate Plaintiffs for ordinary and customary repairs and materials costs places Plaintiffs in the untenable position of either performing incomplete and/or substandard repairs and thus breaching their obligation to automobile owners to return vehicles to pre-accident condition, or performing labor and expending materials without proper compensation and thereby jeopardizing the continuing viability of their business enterprise.

96.     The foregoing concerns prompted a meeting between many body shops involved in an action currently pending in the United States District Court, Southern District of Mississippi, styled as Cause No. 3:14-cv-12-CWR-FKB.  There, body shops, Tim Bartlett, State Farm Estimatix team leader, John Findley, Estimatix section manager, Steve Simkins, State Farm counsel for Mississippi and Alabama, and members of the Mississippi Department of Insurance met in April, 2013.  At this meeting, the members of the automobile collision repair industry expressed their dissatisfaction and concerns

with the very practice of refusing to compensate fully and fairly for repairs that were performed and State Farm's inconsistent application of the database estimating software, i.e., utilizing database estimates only when it is in State Farm's financial best interest to do so.

97.     State Farm representative Bartlett acknowledged before witnesses that repairs and subsequent payment for those repairs should be consistent with the estimates prepared through the database software.  Mr. Bartlett assured those present and the Department of Insurance representative that State Farm would abide by those database estimates and stated it would raise the matter at its insurance industry meetings, held locally approximately once a month.

98.     Also at that meeting, Mr. Simpkins asked if they might be permitted to attend the meetings of the Mississippi automobile collision society.  The auto body representative present for the meeting, John Mosley, agreed and invited State Farm to attend those Association meetings contingent upon State Farm permitting members of the auto body Association to attend the insurance meetings.  Mr. Simkins refused.

99.     Despite the assurances given to the body shop representatives and the Department of Insurance at this meeting, State Farm has failed to perform as promised, in either Mississippi or Indiana.  State Farm, and the other Defendants in collusion with State Farm, have continued to refuse to make payment and/or full payment for necessary and proper repairs.

100.     Defendant State Farm also imposes restrictions upon the Plaintiffs' ability to obtain and utilize quality replacement parts and materials.  As part of its DRP agreement, State Farm asserts it has the unilateral authority to enter into separate

agreements with manufacturers, distributors or suppliers of automotive parts, supplies or materials.

101.    Despite the fact that the shops have no involvement in the negotiation of those separate agreements, they are de facto required to abide by the pricing agreements reached.  Although presented as an option to participate, this option is rendered meaningless by additional language which requires the shops to accept as payment only that amount for which the parts and/or materials could have been obtained through those agreements.  Participation or lack thereof is therefore completely meaningless and the optional language is illusory.

102.    Moreover, shops are required to "stack" this purportedly optional usage of separate agreements with other discounts required elsewhere within the agreement. Thus, the limitation on payment, refusal to compensate for nearly all materials and the compelled discounts cause a shop to operate at or near a loss for each repair.

103.    Though led by State Farm as the dominant market shareholder, upon information and belief, all Defendants have agreed to and/or consciously parallel the compensation ceilings established by State Farm solely for their own profit.

Steering

104.    Upon information and belief, the Defendants regularly and routinely engage in "steering" in order to punish noncompliant shops.  Indiana law prohibits automobile insurance companies from requiring consumers to use particular body shops to effect repairs. In order to avoid facially violating this law, the Defendants will "steer" their insureds and/or claimants to favored compliant shops through misrepresentation, insinuation, and by casting aspersions upon the integrity and quality of disfavored repair

shops.

105.    Examples of this practice include wrongfully:  advising consumers that a particular chosen shop is not on the preferred provider list; relating that quality issues have arisen with that particular shop; that complaints have been received about that particular shop from other consumers; that the shop charges more than any other shop in the area and these additional costs will have to be paid by the consumer; that repairs at the disfavored shop will take much longer than at other, preferred shops and the consumer will be responsible for rental car fees beyond a certain date; and that the particular Defendant cannot guarantee the work of that shop as it can at other shops.

106.    These statements have been made about certain Plaintiffs without any attempt to ascertain the truth thereof.  Further, some of the ills recited that implicitly criticize the shops are wholly attributable to the insurer itself.  For instance, the statement that repairs will take longer at a disfavored shop:  consumers are not told that the delay in beginning repairs is due to the insurer's decision to delay sending an appraiser to evaluate the damage, which is a decision wholly within the control of the Defendant.  Asserting the shop charges more is often not a function of what the shop actually charges but the Defendants' refusal to pay, also a factor wholly and completely within the control of the respective Defendant.  Yet both are wrongfully conveyed to the public as problems with the shop.

107.    The most egregious of these statements – that the Defendant cannot guarantee the work of the shop – is particularly misleading, as none of the Defendants offer a guarantee for repair work.  Instead, the Defendants require the body shops to provide a limited lifetime guarantee on work performed. In the event additional work is

required, the body shop is required to do so without any additional payment, or to indemnify the insurer for costs if work is performed at another shop.

108.    Thus, while it may be a facially truthful statement that an insurer cannot guarantee the work of a particular shop, the clear implication is that it can and will guarantee the work of another, favored shop, which is simply not true.

Intentional Nature of Defendants' Conduct

109.    In 1963, a consent decree was entered in *United States vs. Association of Casualty and Surety Companies*, *et al.,* Docket No. 3106, upon complaint filed in the Southern District of New York. The allegations of that complaint included violations of Sections 1 and 3 of the Sherman Act, also known as the Sherman Antitrust Act.  A copy of this Decree is attached hereto as Exhibit 2.[1]

110.    Specific actions supporting the aforementioned allegations included insurance company practices involving: (1) requiring repair rather than replacement of damaged parts; (2) replacing damaged parts with used rather than new parts; (3) obtaining discounts on new replacement parts; (4) establishing strict labor time allowances; (5) suppressing the hourly labor rate; (6) channeling auto repairs to those repair shops which would abide by the insurer estimates and boycotting those which refused.  The complaint further alleged a conspiracy and combination in unreasonable restraint of trade and commerce for these practices.

111.    The Consent Decree order provided the following relief: it enjoined the defendants from placing into effect any plan, program or practice which has the purpose or effect of directing, advising or otherwise suggesting that any person or firm do

---

[1] A copy of the Decree also appears at https://www.ican2000.com/documents/1963/, last visited April 2, 2014.

business or refuse to do business with any independent or dealer-franchised automotive repair shop with respect to the repair of damage to automobile vehicles; (2) exercising any control over the activities of any appraiser of damages to automotive vehicles; (3) fixing, establishing, maintaining or otherwise controlling the prices to be charged by independent or dealer-franchised automotive repair shops for the repair of damage to automotive vehicles or for replacement parts or labor in connection therewith, whether by coercion, boycott or intimidation or by the use of flat rate or parts manuals or otherwise.

112.    Whether or not any current Defendant is legally bound by this Decree, the actions described in the present cause fall squarely within those prohibited by the Decree. The Decree has been "on the books" for over fifty years and is well-known within the insurance industry.

113.    Upon information and belief, Defendants were fully aware their actions, plans, programs, and combinations and/or conspiracy to effectuate the same have been willful, intentional and conducted with complete and reckless disregard for the rights of the Plaintiffs.

## Legal Claims

### Count I – Quantum Meruit
### Brought Pursuant to State Law

114.    Plaintiffs incorporate and restate by reference herein all allegations set forth above.

115.    Claims alleging quantum meruit rest upon the equitable principle that a party is not allowed to enrich itself at the expense of another.  More specifically, the law implies a promise to pay a reasonable amount for the labor and materials furnished, even absent a specific contract therefore.  *Bayh v. Sonnenburg*, 573 N.E.2d 398 (Ind. 1991)

116.     To prevail upon such a claim, Plaintiffs must show that, "a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit without payment would be unjust." *Bayh*, 573 N.E.2d at 408.

117.     Here, a measurable financial benefit has been conferred upon Defendants under circumstances that their retention of same, without payment to Plaintiffs, would be unjust.

118.     Plaintiffs have performed valuable services and expended material resources with the reasonable expectation of compensation for those services and materials.  Performing said services and expending material resources benefitted Defendants and Defendants' insured and/or claimants for whom Defendants are required to provide payment for repairs.

119.     It has always been foreseeable the Plaintiffs were not performing labor or providing services and materials without expectation of full payment.  However, Defendants have simply taken the position that payment may not be made unless they choose to provide it, regardless of any other factor or consideration and have thus enriched themselves at the expense of Plaintiffs.

120.     Plaintiffs are equitably entitled to receive payment for the materials and services rendered.

121.     In the present case, Defendants' insureds and claimants entrusted the Plaintiffs with the full and complete repair of their vehicles, the cost of which is incumbent upon the Defendants to pay.  An obligation was thus created to provide payment to Plaintiffs for their work and expended materials.

122.    By failing to make partial and/or payment for the necessary and reasonable costs of repair, Defendants have obtained or retained money that, in equity, rightfully belongs to the Plaintiffs

### Count II – Tortious Interference with a Contractual Relationship
### Brought Pursuant to State Law

123.    Plaintiffs incorporate and restate by reference herein all allegations set forth above.

124.    The Defendants have repeatedly steered and attempted to steer customers away from the Plaintiffs' businesses through their repeated campaign of misrepresentation of facts, failure to verify facts damaging or tending to cause damage to the Plaintiffs business reputations before conveying the same to members of the public, implications of poor quality work, poor quality efficiency, poor business ethics and practices, and unreliability.

125.    The purpose of these actions was twofold: to punish the Plaintiffs who complained about or refused to submit to the oppressive and unilateral price ceilings the Defendants were enforcing upon them, and to direct potential customers of the Plaintiffs to other vendors who would comply with the maximum price ceiling unilaterally imposed by the Defendants.

126.    A tortious interference with a contractual relationship occurs when a valid and enforceable contract exists, of which the defendants know, and intentionally induce breach thereof, without justification, which results in damages.  *Melton v. Ousley*, 925 N.E.2d 430, 440 (Ind. Ct. App. 2010).

127.    Multiple contractual relationships exist, or have existed, between Plaintiffs and consumers, of which Defendants know.

128.    The Defendants have, through their actions described *supra*, intentionally and maliciously induced the breach of these contractual relationships, without justification.

129.    The above breach of the contractual relationships have proximately caused Plaintiffs damages, including financial losses.

### Count III – Tortious Interference with a Business Relationship Brought Pursuant to State Law

130.    Plaintiffs incorporate and restate by reference herein all allegations set forth above.

131.    The Defendants have repeatedly steered and attempted to steer customers away from the Plaintiffs' businesses through their repeated campaign of misrepresentation of facts, failure to verify facts damaging or tending to cause damage to the Plaintiffs' business reputations before conveying the implications of poor quality work, poor quality efficiency, poor business ethics and practices, and unreliability to members of the public.

132.    The purpose of these actions was twofold: to punish the Plaintiffs who complained about or refused to submit to the oppressive and unilateral price ceilings the Defendants were enforcing upon them, and to direct potential customers of the Plaintiffs to other vendors who would comply with the maximum price ceiling unilaterally imposed by the Defendants.

133.    A tortious interference with a business relationship occurs when a business relationship exists, of which the defendants know, and intentionally induce breach thereof, illegally and without justification, which results in damages.  *Melton*, 925 N.E.2d 430 at 440 (Ind. Ct. App. 2010) (n. 9).

26

134.    Multiple business relationships exist, or have existed, between Plaintiffs and consumers, of which Defendants know.

135.    The Defendants have through their actions described *supra* intentionally and maliciously induced the breach of these contractual relationships.

136.    The Defendants' behavior described *supra* violates Ind. Code 27-4-1, *et seq*., in particular the following provision:

> Sec. 3. No person shall engage in this state in any trade practice which is defined in this chapter or determined pursuant to this chapter as an unfair method of competition or as an unfair or deceptive act or practice in the business of insurance as defined in IC 27-1-2-3.

I.C. 27-4-1-3

137.    Indiana Code provides examples of unfair methods of competition, and unfair or deceptive acts or practices in the business of insurance, including, but not limited to, the following:

> Sec. 4. (a) The following are hereby defined as unfair methods of competition and unfair and deceptive acts and practices in the business of insurance:
>
> (1) Making, issuing, circulating, or causing to be made, issued, or circulated, any estimate, illustration, circular, or statement;
>
> (A) misrepresenting the terms of any policy issued or to be issued or the benefits or advantages promised thereby or the dividends or share of the surplus to be received thereon… ;
>
> (E) making any misrepresentation to any policyholder insured in any company for the purpose of inducing or tending to induce such policyholder to lapse, forfeit, or surrender the policyholder's insurance….
>
> (16) Committing or performing, with such frequency as to indicate a general practice, unfair claim settlement practices (as defined in section 4.5 of this chapter).

I.C. § 27-4-1-4

138.    Indiana Code also enumerates certain "unfair claim settlement practices":

> Sec. 4.5. The following are unfair claim settlement
> practices:
>       (1) Misrepresenting pertinent facts or insurance policy
> provisions relating to coverages at issue…
>
>       (4) Refusing to pay claims without conducting a
> reasonable investigation based upon all available
> information…
>
>       (6) Not attempting in good faith to effectuate prompt,
> fair, and equitable settlements of claims in which liability
> has become reasonably clear.
>
>       (8) Attempting to settle a claim for less than the
> amount to which a reasonable individual would have
> believed the individual was entitled by reference to written
> or printed advertising material accompanying or made part
> of an application.
>
>       (16) The unfair claims settlement practices defined in
> IC 27-4-1.5.

I.C. § 27-4-1-4.5

139.    Defendants have violated, by their intentional conduct described *supra*,

the unfair methods of competition, unfair or deceptive acts or practices in the business of

insurance, and/or the unfair claims settlement practices noted above.[2]

140.    The tortious interference with business relationships have caused Plaintiffs

damages, including financial losses.

### Count IV – Violations of the Sherman Act – Price-Fixing
### Brought Pursuant to 15 U.S.C. § 1

141.    Plaintiffs incorporate and restate by reference herein all allegations set

---

[2]Count III is not being brought pursuant to any cause of action granted by Ind. Code § 27, but statutory excerpts are cited to illustrate only the illegality of the alleged conduct.

forth above.

142.    The Sherman Act prohibits contracts, combinations or conspiracies in restraint of trade.  15 U.S.C. § 1.  Such agreements are illegal if (1) their purpose or effect is to create an unreasonable restraint of trade, or (2) they constitute a per se violation of the statute.

143.    Through parallel actions, and/or explicit agreement, the Defendants have formed and engaged in a vertical conspiracy or combination to impose maximum price limits upon the Plaintiffs for their products and services.

144.    The United States Supreme Court has noted that agreements to fix maximum prices, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment.  *Kiefer-Stewart Co. v. Joseph E. Seagram and Sons, Inc.*, 340 U.S. 211 (1951).

145.    The Defendants and co–conspirators have engaged in combination and/or conspiracy in an unreasonable restraint of trade and commerce in the automobile damage repair industry that affects interstate commerce and unreasonably restrains trade.

146.    The aforesaid combination and/or conspiracy has consisted of a continuing agreement in concert of action among the Defendants and co-conspirators to control and suppress automobile damage repair costs, automobile material repair costs through coercion and intimidation of these shops.

147.    Evidence of this conspiracy or combination include, but is not limited to, admission before witnesses that members of the insurance industry meet regularly to discuss such matters in and amongst themselves but refused to allow members of the auto collision repair industry to attend those meetings, explicit statements by Defendants that

they will conform to State Farm's imposed payment structure but failing to do so, followed by the uniformity of action of all Defendants.

148.    The aforesaid offenses have had, among others, the effect of eliminating competition within the automobile damage repair industry, elimination of some shops from a substantial segment of the automobile damage repair industry for refusing or attempting to refuse the Defendants' arbitrary price ceilings, and subjecting repair shops to collective control and supervision of prices by the Defendants and co-conspirators.

149.    Neither the Plaintiffs, nor other members of the auto collision repair industry, are able to effectively engage in competitive business practices as the Defendants have effectively and explicitly determined what their business practices will be.

150.    The individual and collective actions of the Defendants have violated federal law and proximately caused the Plaintiffs to incur substantial damages.  The pattern and practice of the Defendants continue and will continue unless and until the relief herein prayed for is granted.

### Count V – Violations of the Sherman Act – Boycott
### Brought Pursuant to 15 U.S.C. § 1

151.    Plaintiffs incorporate and restate by reference herein all allegations set forth above.

152.    The United States Supreme Court has held that boycotts constitute a violation of the Sherman Act, 15 U. S. C. § 1.  A "boycott" has been defined within the antitrust law context as "pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target." *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 541 (1978).

153.    The Defendants have engaged, and continue to engage, in boycott and boycotting activity through their repeated actions of steering customers away from the Plaintiffs through allegations and intimations of poor quality work, of poor efficiency in performing work, of questionable business practices, of overcharging, impugning integrity, and similar actions so as to withhold and/or enlist others to withhold patronage from the Plaintiffs.

154.    This boycott was specifically designed to pressure, intimidate, and/or coerce the Plaintiffs into complying with the maximum-price limitations unilaterally conceived by State Farm and agreed to collusively by the other Defendants.

155.    The Defendants and co–conspirators have engaged in combination and conspiracy in unreasonable restraint of trade and commerce in the automobile damage repair industry that affects interstate commerce and unreasonably restrains trade.

156.    It is irrelevant for purposes of Sherman antitrust boycott activity that the Plaintiffs and Defendants are not direct competitors within the same industry: "boycotters and the ultimate target need not be in a competitive relationship with each other." *St. Paul Fire and Marine Insurance Company*, 438 U.S. at 543.

157.    The enlistment of third parties as a means of compelling capitulation by the boycotted group has long been viewed as conduct supporting a finding of unlawful boycott. *Id.*

158.    In the present matter, the Defendants have not only engaged in a boycott, but have regularly, routinely and purposefully enlisted the aid of unwitting third parties in carrying out their boycott through their intentional acts of steering those customers away from the Plaintiffs.

159.    Defendants' boycott was created and carried out with the sole purpose and intent of financially coercing and threatening the Plaintiffs into complying with the Defendants' price caps.

160.    The Defendants' actions are violations of federal law and have proximately caused the Plaintiffs to incur substantial damages. Defendants are continuing and will continue said offenses unless the relief requested herein is granted.

**Prayer for Relief**

161.    Plaintiffs incorporate and restate by reference herein all allegations set forth above.

162.    As a result of the Defendants' actions, Plaintiffs have been substantially harmed and will continue to suffer unless and until the relief requested herein is granted. The Plaintiffs therefore pray for the following relief:

A.    Compensatory damages for all non-payment and underpayment for work completed on behalf of the Defendants' insureds and claimants as determined by a jury.

B.    Damages sufficient to compensate Plaintiffs for lost business opportunities as determined by a jury.

C.    Treble damages, reasonable attorneys' fees and costs for violations of the Sherman Act, as required under 15 U.S.C. § 15.

D.    Injunctive relief prohibiting the Defendants from further engaging in any of the following:

(I) Placing into effect any plan, program or practice which has the purpose or effect of:

(a)  directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any Plaintiff automotive repair shop with respect to the repair of damage to automobiles.

(b)  fixing, establishing or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automobiles or for replacement parts or labor in connection therewith whether by coercion, boycott or intimidation, or by the use of flat rate or parts manuals or otherwise.

(2)  Placing into effect any plan, program or practice which explicitly requires or has the purpose or effect of requiring Plaintiffs to participate in any parts procurement program.

(3)  Providing untruthful and/or unverified information to customers or third persons regarding the quality, cost, efficiency or reputation of any Plaintiff ("steering").

(4)  Prohibiting Defendant State Farm from altering or amending any Plaintiff response to its survey without the express written permission of the affected Plaintiff.

E.  Punitive and/or exemplary damages sufficient to punish Defendants for their intentional acts and deter each Defendant and similar entities from pursuing this improper conduct in the future.

F.  Pre- and post-judgment interest.

G.      Any additional relief the Court deems just and appropriate.

Respectfully submitted,

SNIDERMAN NGUYEN LLP


*s/ Mark W. Sniderman*
Mark W. Sniderman
Atty. No. 26599-49
47 S. Meridian St., Ste. 400
Indianapolis, IN  46204
317.361.4700 Tel
317.464.5111 Fx
mark@snlawyers.com

*Attorney for Plaintiffs*