UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

INDIANA AUTOBODY ASSOCIATION,
INC., GARY CONNS COLLISION
CENTER, INC., CROSS PAINT & BODY
SHOP, INCORPORATED, DAN T.
GRATZ BODY SHOP, INC.,
ENNEKING'S AUTO BODY, INC.,
EXCEL AUTO BODY, INC., JON'S BODY
SHOP, INC., MAIN STREET BODY
SHOP, INC., MINTON BODY SHOP,
INC., PRESTIGE AUTO BODY REPAIR,
INC., KEVIN WELLS, SOUTHLAKE
COLLISION CENTER, INC., TEAM 150,
INC., CARL THURMAN, CLARKSVILLE
COLLISION CENTER, INC., MATTINGLY
COLLISION CENTER, INC.,
GENERATIONS CUSTOM AUTO &
COLLISION, INC., AUTO BODY
SPECIALTIES OF LAFAYETTE, INC.,
BROTHERS BODY AND PAINT OF
MORGAN COUNTY, INC., WILKERSON
BODY AND FRAME, INC., CLARK
AUTOMOTIVE, INC., HARWOOD
COLLISION REPAIR, LLC, VOELZ
BODY SHOP, INC., NEARY COLLISION,
INC., MARTIN'S BODY SHOP, INC. and
JONKMAN GARAGE, INC.,

     Plaintiffs,

v.                                  Case No:   6:14-cv-6001-Orl-31TBS

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,   STATE
FARM FIRE AND CASUALTY
COMPANY, STATE FARM GENERAL
INSURANCE COMPANY,
PROGRESSIVE CASUALTY
INSURANCE COMPANY,
PROGRESSIVE AMERICAN
INSURANCE COMPANY,
PROGRESSIVE CLASSIC INSURANCE
COMPANY, PROGRESSIVE DIRECT
INSURANCE COMPANY,

PROGRESSIVE MAX INSURANCE
COMPANY, INDIANA FARMERS
MUTUAL INSURANCE COMPANY,
ALLSTATE INDEMNITY COMPANY,
ALLSTATE INSURANCE COMPANY,
ALLSTATE PROPERTY AND
CASUALTY INSURANCE COMPANY,
ALLSTATE VEHICLE AND PROPERTY
INSURANCE COMPANY, GEICO
GENERAL INSURANCE COMPANY,
GEICO INDEMNITY COMPANY,
SHELTER GENERAL INSURANCE
COMPANY, SHELTER MUTUAL
INSURANCE COMPANY, NATIONWIDE
MUTUAL INSURANCE COMPANY,
NATIONWIDE PROPERTY AND
CASUALTY INSURANCE COMPANY,
NATIONWIDE ASSURANCE COMPANY,
AMERICAN FAMILY MUTUAL
INSURANCE COMPANY, ZURICH
AMERICAN INSURANCE COMPANY,
ZURICH AMERICAN INSURANCE
COMPANY OF ILLINOIS, LIBERTY
MUTUAL INSURANCE COMPANY,
SAFECO INSURANCE COMPANY OF
INDIANA, AMERICAN STATES
INSURANCE COMPANY and INDIANA
INSURANCE COMPANY,

     Defendants.

_____

## REPORT AND RECOMMENDATION

     This case comes before me on referral from the district judge, for report and

recommendation on the questions of state law raised in the following motion papers:

- Motion to Dismiss Plaintiffs' Second Amended Complaint by Liberty, Nationwide, American Family, and Indiana Farmers Defendants (Doc. 154);

- Geico General Insurance Company and Geico Indemnity Company's Motion and Supporting Memorandum to Dismiss Second Amended Complaint and Demand for Jury Trial (Doc. 155);

- Certain Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 156);

- Plaintiffs' Omnibus Response to Certain Motions to Dismiss (Doc. 158);

- Reply Memorandum by Liberty, Nationwide, American Family and Indiana Farms Defendants in Support of Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 162);

- Geico General Insurance Company and Geico Indemnity Company's Reply in Support of Motion and Supporting Memorandum to Dismiss Second Amended Complaint and Demand for Jury Trial (Doc. 163); and

- Certain Defendants' Reply in Support of Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 164).

After due consideration, I respectfully recommend that the motions be **GRANTED in part**, and that Plaintiffs' state law claims be dismissed with prejudice.

## I. Background

The Court is familiar with the background of this case.   Plaintiffs are a group of Indiana auto body repair shops and a not-for-profit trade organization that represents Indiana businesses engaged in the collision repair of automobiles.   Defendants are insurance companies that write automobile insurance in the state of Indiana.   Over a course of years, Plaintiffs have provided motor vehicle collision repair services to Defendants' policyholders and claimants (Doc. 151, ¶ 78).   Plaintiffs allege that "Defendants have engaged in an ongoing, concerted and combined intentional course of action and conduct to improperly and illegally control and depress automobile damage repair costs to the detriment of the Plaintiffs and the substantial profit of the Defendants." (Id. at ¶ 80).   Defendants have allegedly

> intentionally combined to utilize their aggregated market power to exert control over every aspect of the collision repair industry, including but not limited to price fixing of labor rates, price fixing of replacement parts, compulsory use of substandard or dangerous replacement parts, compulsory use

> of a parts procurement program which directly financially benefits State Farm Defendants and indirectly benefits the remaining Defendants, boycotting shops which refuse to comply with either fixed prices or use of substandard or improper parts, and interfering with Plaintiffs' current and prospective business relations by intentionally misrepresenting and making knowingly false statements regarding the quality, efficiency and ethical reputation of Plaintiffs' businesses, exerted economic duress and coercion upon both the Plaintiffs to capitulate and upon consumers, including direct threats to consumers to refuse coverage or portions of available coverage if consumers persist in their efforts to patronize Plaintiffs' businesses.

(Id. at ¶ 82).   Defendants actions are alleged to "have caused a complete eradication of competition within the body shop industry" in violation of federal and state law (Id. at ¶¶ 83-84).

Plaintiffs filed their original complaint in the United States District Court for the Southern District of Indiana on April 2, 2014 (Doc. 1).   On August 12, 2014, the United States Judicial Panel on Multidistrict Litigation transferred this and three other cases to this district for coordinated or consolidated pretrial proceedings before Senior District Judge Gregory A. Presnell.   In re Auto Body Shop Antitrust Litigation, 37 F. Supp. 3d. 1388 (J.P.M.L. Aug. 8, 2014).   Six days later, Plaintiffs filed their first amended complaint (Doc. 123).   The Court dismissed the amended complaint without prejudice, with leave to amend (Docs. 145, 150).

Plaintiffs' Second Amended Complaint (the "SAC") alleges claims of price fixing and illegal boycott in violation of the Sherman Act, 15 U.S.C. § 1, and state-law claims for tortious interference with a business relationship and quantum meruit (Doc. 151).   All Defendants have motioned the Court to dismiss the SAC, Plaintiffs' have responded, and Defendants have filed replies.

## II. Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  Conley v. Gibson, 355 U.S. 41, 47 (1957), overruled on other grounds, Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). A Rule 12(b)(6) motion to dismiss for failure to state a claim merely tests the  sufficiency of the complaint; it does not decide the merits of the case.  Milburn v. United States, 734 F.2d 762, 765 (11th Cir. 1984).   In determining whether dismissal on this basis is appropriate, the complaint must be construed in the light most favorable to the plaintiff, and all well-pleaded facts must be accepted as true.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Ironworkers Local Union 68 v. AstraZeneca Pharm., LP, 634 F.3d 1352, 1359 (11th Cir. 2011).   The Supreme Court has explained that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."  Twombly, 550 U.S. at 546.   The court should liberally construe the complaint's allegations in plaintiff's favor.  Jenkins v. McKeithen, 395 U.S. 411, 421 (1969).   But, a claim for relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555.   "Factual allegations must be enough to raise a right to relief above the speculative level[.]"  Id.   A complaint must be dismissed if it does not plead "enough facts to state a claim to relief that is plausible on its face."  Id. at 570.   Legal conclusions devoid of factual support are not entitled to an assumption of truth.  Mamani v. Berzain, 654 F.3d 1148, 1153 (11th Cir. 2011) (citing Iqbal, 556 U.S. at 678); Davila v. Delta Air Lines, Inc., 326 F.3d 1183, 1185 (11th Cir. 2003).

## III. Discussion

Count III: Tortious Interference with a Business Relationship

Indiana courts recognize a cause of action for tortious interference with a business relationship where the defendant wrongfully prevents the plaintiff and a third party from forming a contract.   The elements of this claim are: (1) the existence of a valid business relationship; (2) of which the defendant knew; (3) in which the defendant intentionally and illegally interfered; (4) without justification; and (5) damage to the plaintiff resulting from the defendant's interference.   Economation, Inc. v. Automated Conveyor Sys. Inc., 694 F. Supp. 553, 556 (S.D. Ind. 1988) (citing Flintridge Station Assocs. v. Am. Fletcher Mortg. Co., 761 F.2d 434, 440-41 (7th Cir. 1985)).

The Court dismissed Plaintiffs' amended complaint of tortious interference with a business relationship because it relied upon group pleading which resulted in allegations that every Defendant tortiously interfered in the business of every Plaintiff with respect to all the same customers (Doc. 145 at 10-12; Doc. 150).   The Court found these allegations implausible and noted that Indiana law "defines the elements of tortious interference with business relationships in terms of specific, individual relationships between the plaintiff and third parties in which the defendant interferes."   (Doc. 145 at 10-12; Doc. 150).   The Court also found that Plaintiffs failed to allege the existence of a "valid business relationship" because they offered little more than "bald assertions of possible business opportunities" in the form of return visits from past customers (Doc. 145 at 12; Doc. 150).

Defendants seek dismissal of the tortious interference count in the SAC on the grounds that Plaintiffs continue to rely on group pleading; they fail to allege specific, individual relationships between any Plaintiff and a third party in which Defendants

interfered; Plaintiffs fail to allege that the interference was illegal (or fail to identify the specific law that was allegedly violated); they fail to allege lack of justifiable cause; fail to allege damages resulting from Defendants' conduct; and otherwise fail to allege facts to establish the elements of their claim (Doc. 154 at 16-18; Doc. 155 at 18-21; Doc. 156 at 18-22).

Plaintiffs argue that the motions should be denied because they have now alleged specific instances of interference, both successful and unsuccessful, and they have identified the specific class of customers with whom the Defendants interfered (customers who told Defendants they wanted to have their vehicles repaired by one of the Plaintiffs) (Doc. 158 at 38).   Plaintiffs say that "where specific examples are not available at the present time, the Plaintiffs set forth facts showing that when one known Defendant engaged in a campaign of interference (steering) other Defendants likewise so engaged." (Id. at 39).   And, Plaintiffs submit that they "have provided concrete examples of known events of interference by the specified Defendants, and provided concrete examples of demonstrable losses of business contemporaneous with those specific examples of interference."   (Id.).

Plaintiffs' arguments rely on two sections of the SAC, the first of which alleges that Defendants improperly steered customers away from Plaintiffs' shops:

> 316. Consumer Lowell Shaffer identified Plaintiff Conn's Collision as his choice of repair shop to insurer Safeco. Safeco told Mr. Shaffer he was required to go to one of Safeco's preferred repair shops to have an estimate performed before going to Conn's, that Conn's was not one of Safeco's preferred shops, that if Mr. Shaffer went to a Safeco-preferred shop, the repair would be performed faster.   Mr. Shaffer felt significantly pressured by Safeco to go [sic] another shop rather than the shop of his choice, Plaintiff Con's.

317. Consumer Henry Shafer identified Plaintiff Martin's Body Shop as his choice of repair shop to insurer Liberty Mutual. Liberty Mutual told Mr. Shafer that Martin's was not on their preferred list of shops, that going to Martin's would mean the repairs would take longer, that if he took his vehicle to Martin's, Liberty Mutual would not warranty the repairs performed but going to a Liberty Mutual preferred shop would result in a warranty of the repairs performed.   As a result, Mr. Shafer felt significantly pressured by Liberty Mutual to go to another shop rather than the shop of his choice, Plaintiff Martin's.

318. Consumer Michael Hawkins identified Plaintiff Martin's Body Shop as his choice of repair shop to Defendant Allstate. Allstate told Mr. Hawkins that if he used the shop of his choice, he would have to pay more for the repair, that Allstate would not warrant the repairs performed at Martin's but going to a preferred shop would result in a warranty of the work performed, that Martin's was difficult and "we can't work with that shop," and if Mr. Hawkins went to a preferred shop, Allstate could pay that shop directly and Mr. Hawkins could get his vehicle back faster.   As a result, Mr. Hawkins felt significantly pressured by Allstate to go to another shop rather than the shop of his choice, Plaintiff Martin's.

319. Consumer Tim Miller tried on three separate occasions to have his vehicle towed to Plaintiff Brothers Body & Paint. Without his permission and against his wishes, State Farm towed his vehicle to a preferred shop and refused to allow it to be taken to Brothers.

(Doc. 151, ¶¶ 316-19 (emphasis omitted)).   These are the only averments in the SAC that a specific Defendant attempted to steer an identified consumer away from one of Plaintiffs' repair shops.

The second set of allegations upon which Plaintiffs rely concern alleged boycotting by Defendants:

343. As an example, Plaintiff Brothers disassociated from State Farm's DRP[1]  in  November, 2013.   Although there had

---

[1] "DRP" is a reference to a "direct repair program."   (Doc. 151, ¶ 131).   Many Defendants allegedly instituted DRPs for the stated purpose of benefitting claimants by ensuring a pre-screened pool of reputable body shops to whom claimants could be referred (Id.).   Plaintiffs allege that in reality, Defendants employ DRPs to suppress repair costs to the detriment of Plaintiffs and their customers (Id. at ¶ 134).

been no change in quality of repairs, equipment or skilled technicians, State Farm immediately began its campaign-telling customers and prospective customers who had identified Brothers as their chosen body shop that State Farm had been receiving complaints about Brothers, that it would take a week or more before an adjuster could come to Brothers to view the damaged vehicle, that the customer would have to pay out of pocket for Brothers overcharging and State Farm has "problems" with Brothers.   State Farm has made these statements to consumers when consumers called State Farm while the consumer was standing in Brothers' shop.

344. State Farm began telling customers and potential customers these things, though nothing had changed between the day Brothers left State Farm's DRP and the following day when it began steering customers away from Brothers.

345. The effectiveness of State Farm's campaign of falsehood and misinformation is shown in the numbers.   From 2013 to 2014, revenue generated at Brothers by State Farm claimant and insured vehicles dropped by over sixty percent, from approximately $500,000.00 in 2013 and to $187,000.00 in 2014.

346. Although Brothers only disassociated from the State Farm DRP, the numbers show State Farm shared this information with other Defendants who also began targeting Brothers for steering punishment.

347. After disassociating from State Farm, Brothers' repair work for American Family insureds and claimants dropped by nearly sixty percent (60%), Farmers (Zurich) by nearly fifty percent (50%), Liberty Mutual by twenty-five percent (25%), and Shelter by forty percent (40%).

348. Thus while it may be an essentially benign statement that up to seventy-five percent (75%) of Plaintiffs' business comes from insurer-paid repairs, when placed in context the numbers are striking.   Losing fifty, sixty or seventy percent of (50-60-70%) of one's revenue sources leaves the Plaintiffs' businesses in financially perilous waters and substantially affects the ability of most to remain open as a going concern.

349. This is even more apparent when recalling the named Defendants effectively control over fifty-seven percent (57%) of the private passenger insurance market and exert

substantial control over where insureds and claimants take
their vehicles for repairs.

(Doc. 151, ¶¶ 343-49).

With the exception of these averments against Defendants Safeco, Liberty Mutual, Farmers, Allstate and State Farm,[2] no Defendant is specifically alleged to have engaged in improper steering, the making of disparaging remarks, or the refusal to deal with Plaintiffs.   There are also no allegations that any Plaintiff lost a single customer due to the actions of the other, unnamed Defendants.   Accordingly, I find that the SAC fails to state a claim for tortious interference with business relationship against any Defendant with the possible exception of Defendants Safeco, Liberty Mutual, Farmers, Allstate and State Farm.

Plaintiffs' averments otherwise fail to state a cause of action against any Defendant for tortious interference with a business relationship under Indiana law. Plaintiffs do not allege that any Defendant succeeded in steering Lowell Shaffer, Henry Shaffer, Michael Hawkins, Tim Miller, or any other identified consumer away from any Plaintiff's shop.   To the contrary, the SAC alleges that "[t]he punitive and malicious nature of Defendants' interference is exemplified by the <u>failed steering instances described above</u>."   (<u>Id</u>. at ¶ 325) (emphasis supplied)).   Defendants' unsuccessful attempts at steering prospective customers do not constitute tortious interference with business relations.   Indiana law requires actual damage resulting from the interference, and Plaintiffs have not averred a cognizable injury in any situation where a Defendant

---

[2] In the SAC, "Allstate" is a collective reference to Allstate Indemnity Company, Allstate Property and Casualty Company, Allstate Insurance Company, and Allstate Vehicle and Property Insurance Company (Doc. 151, ¶ 64).   "State Farm" is a collective reference to State Farm Mutual Automobile Insurance Company, State Farm Fire and Casualty Company, and State Farm General Insurance Company (<u>Id</u>. at ¶ 34).

was unsuccessful in its attempt to steer someone away from a Plaintiff's business.
Economation, Inc., 694 F. Supp. at 556.

If the Court disagrees and finds that Plaintiffs have alleged that a Defendant
successfully steered a prospective customer away from a Plaintiff, then the SAC fails to
allege facts to state a claim for relief that is plausible on its face.   Indiana courts apply
the requirement of a "valid business relationship" to limit relief to plaintiffs who can
demonstrate a sufficiently well-defined expectation that a contract would be created
before the defendant interfered.   For example, in Comfax Corp. v. N. Am. Van Lines,
Inc., 587 N.E.2d 118 (Ind. App. 1992), the court upheld the grant of summary judgment
on a tortious interference claim because the plaintiff "failed to show that [it] had a valid
business relationship with a third party with which [the counter-defendant] interfered."   Id.
at 124.   The court emphasized that a valid business relationship requires more than
"bald assertions of possible business opportunities."   Id.   See also Gov't Payment Serv.,
Inc. v. Ace Bail Bonds, 854 N.E.2d 1205, 1209-10 (Ind. App. 2006) (finding no business
relationship between bail agents and local governments); Computers Unlimited, Inc. v.
Midwest Data Sys., 657 N.E.2d 165, 168-69 (Ind. App. 1995) (finding no business
relationship as a matter of law where contract between plaintiff and third party had
terminated and there was no reason to believe that continued negotiations to resolve
disputes arising from expired contract "constituted a continuance of the business
relationship").   Plaintiffs' tortious interference claim is comprised of nothing more than
bald assertions of possible business opportunities.   Nowhere is it alleged that any
prospective customer ever did business with a Plaintiff.   There are also no facts alleged
to show that any Plaintiff would have entered into a contract with an identified customer
but for the alleged interference.   As a consequence, the SAC does not contain enough

facts to show the existence of a valid business relationship necessary to support a claim for tortious interference by any Defendant against any Plaintiff.   This is true with regard to Plaintiffs' allegations of improper steering and boycott.

In the absence of facts to show a valid business relationship between any Plaintiff and any prospective customer, the SAC is insufficient to allege that any Plaintiff suffered an injury caused by the alleged tortious interference.

This count also fails because tortious interference with a business relationship requires illegal conduct on the part of the defendant.   Melton v. Ousley, 925 N.E.2d 430, 440 n.9 (Ind. App. 2010).   The requirement that the defendant act illegally is "critical" to a claim of tortious interference with a business relationship.   Economation, Inc., 694 F. Supp. at 556 (quoting Great Escape, Inc. v. Union City Body Co., Inc., 791 F.2d 532, 542 (7th Cir. 1986)).   In an effort to satisfy this requirement, Plaintiffs allege:

> Defendants behavior described above violates Indiana Code 27-4-1, et seq., in particular the following provision:
>
>> Sec. 3.   No person shall engage in this state in any trade practice which is defined in this chapter or determined pursuant to this chapter as an unfair method of competition or as an unfair or deceptive act or practice in the business of insurance as defined in IC 27-1-2-3.

(Doc. 151, ¶ 481).

When subparts are included, Indiana Code § 27-4-1-4 enumerates over 40 unfair methods of competition and unfair and deceptive acts and practices in the insurance business.   This makes it impossible for the reader to know what unlawful conduct Defendants engaged in.

In their memorandum in opposition to the motions to dismiss, Plaintiffs cite IC 27-4-1-4(a)(16) which states that: "Committing or performing, with such frequency as to

indicate a general practice, unfair claim settlement practices (as defined in section 4.5 of this chapter)" is an unfair method of competition, or unfair and deceptive act or practice. Plaintiffs also reference IC § 27-4-1-4.5 which enumerates more than 15 unfair claim settlement practices.[3]   But after reading these code sections, Defendants and the Court are still left not knowing what specific violations of law Defendants allegedly committed.

As proof of Defendants' violations of the Indiana Code Plaintiffs allege that Defendants require Plaintiffs to omit necessary operations and procedures to return vehicles to their pre-accident condition, and require Plaintiffs to use substandard, dangerous or otherwise inferior replacement parts.   But these allegations are general and do not include the who, what, when, where, or how for any time this occurred. Plaintiffs disagree and cite their averments concerning Lowell Shaffer, Henry Shaffer, Michael Hawkins, and Tim Miller.   But, all they say with regard to these customers is that: "In each instance, the Defendant insurer refused to pay the full cost of repairs, either by refusing to pay the posted labor rates, refusing to pay for necessary procedures or processes, utilizing salvaged parts or aftermarket parts instead of OEM parts designed to fit a particular vehicle, capping paint and materials or similar activities, or a combination of these actions."   (Doc. 151, ¶ 323).   These averments are too vague, general, and conclusory to inform Defendants or the Court of a law violation by any Defendant.

Still, Plaintiffs contend that they have satisfied the requirement that Defendants engaged in illegal conduct by alleging that Defendants defamed Plaintiffs (Id. at ¶ 486). This argument fails because under Indiana law, defamation is not illegal conduct for

---

[3] IC § 27-4-1-4.5(16) incorporates by reference "[t]he unfair claims settlement practices defined in IC 27-4-1.5," which identifies multiple unfair claim settlement practices.

purposes of tortious interference with a business relationship.   Melton, 925 N.E.2d at 436.

Another elements of a claim for tortious interference with a business relationship under Indiana law is the absence of justification.   Computers Unlimited, 657 N.E.2d at 169.   The lack of justification is established by showing "the interferer acted intentionally, without a legitimate purpose, and the breach is malicious and exclusively directed to the injury and damage of another."   Melton, 925 N.E.2d at 441.   The Indiana Supreme Court has referred to the Restatement (Second) of Torts 767 (1977), for factors which may be considered when deciding if a defendant's actions were justified.   Winkler v. V.G. Reed & Sons, Inc., 638 N.E.2d 1228, 1235 (Ind. 1994).   These factors include:

> (a) the nature of the actor's conduct,
>
> (b) the actor's motive,
>
> (c) the interests of the other with which the actor's conduct interferes,
>
> (d) the interests sought to be advanced by the actor,
>
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
>
> (f) the proximity or remoteness of the actor's conduct to the interference and,
>
> (g) the relationship between the parties.

Restatement (Second) of Torts § 767 (1979).

Defendants argue that as third party payors, they have a legitimate interest in reducing the cost of automobile repairs which is a proper motive, and therefore, their actions are justified.   Plaintiffs acknowledge Defendants' financial interest when they aver that Defendants acted to "improperly and illegally control and depress automobile damage repair costs to the detriment of the Plaintiffs and the substantial profit of the

Defendants (Doc. 151, ¶ 80).   In <u>A & E Auto Body, Inc. v. 21st Century Centennial Ins.</u> <u>Co.</u>, No. 6:14-cv-2257-31TBS, 2015 WL 304048, at *8 (M.D. Fla. Jan. 21, 2015), the Court, applying Florida law, concluded that an insurer has a financial interest in the relationship between its insured and the body shop making the repair.   Based on this relationship, the Court held that an insurer has a qualified privilege to interfere, so long as the means it employs are not improper.   The Court said a tortious interference claim could succeed if improper means were utilized to accomplish the interference. Defendants maintain that because they have a financial interest in the relationship between their insureds and Plaintiffs, and because the SAC does not allege how or why their conduct was illegal, the SAC fails to allege a lack of justification for Defendants' actions.   I disagree.

The SAC contains allegations that steering is pointless since Defendants pay the same for the repairs regardless of who performs them (Doc. 151, ¶ 327).   So Plaintiffs complain, the only reason Defendants steer consumers is to punish Plaintiffs.   The SAC also alleges that Defendants make false statements to consumers concerning difficulties they claim to have had when dealing with Plaintiffs, and that if a consumer takes her vehicle to a Plaintiff the work will not be guaranteed (<u>Id</u>. at ¶¶ 328, 333).   The SAC alleges that Defendants intentionally delay the repair process if a consumer selects a Plaintiffs' shop (<u>Id</u>. at ¶¶ 329-332).   And, that Defendants steer consumers to body shops they know do bad work (<u>Id</u>. at ¶ 336).   If proven at trial, these allegations are sufficient to prove Defendants' alleged interference was not justified.

However, the tortious interference claim is still an example of impermissible group pleading.   Apart from the averments concerning Lowell Shaffer, Henry Shaffer, Michael Hawkins, and Tim Miller, the SAC continues to allege interference by all Defendants

against all Plaintiffs, concerning all the same prospective customers.   Plaintiffs argue that their claim should not be dismissed because the evidence to prove it is within the control and possession of Defendants.   This is not credible.   Before tortious interference with a business relationship could occur, there had to be a valid relationship between a Plaintiff and a consumer that would have resulted in a contract, but for the interference. Consequently, Plaintiffs must know whose business they lost.   They may not always know why they lost the business, but each Plaintiff should be able to identify at least one specific relationship with which each Defendant successfully interfered.   Because the SAC does not contain this information, it does not raise Plaintiffs' "right to relief above the speculative level."   Twombly, 550 U.S. at 555.

The cases Plaintiffs cite as proof that group pleading is permissible are inapposite. State Farm Mut. Auto. Ins. Co. v. Universal Health Grp., Inc., No. 14-cv-10266, 2014 U.S. Dist. LEXIS 151213 (E.D. Mich. Oct. 24, 2014), concerned the use of group pleading of a fraud claim.   The court said group pleading was improper, but that plaintiff's allegations were sufficient because they provided a list of hundreds of false claims each defendant allegedly contributed to or orchestrated, and each defendant had received sufficient notice of the misrepresentations it allegedly made.   The court said this was sufficient to allow the defendants to answer and address in an informed way, the plaintiff's claim of fraud.   This is precisely the sort of detail that is missing from the SAC.

Plaintiffs cite another fraud case, Llewellyn-Jones v Metro Prop. Grp., LLC, 22 F. Supp. 3d 760, 780 (E.D. Mich. 2014), where the court said group pleading is improper and does not satisfy the specificity requirements of FED. R. CIV. P. 9(b).   The court said: "'The threshold test is whether the complaint places the defendant on sufficient notice of the misrepresentation allowing the defendants to answer, addressing in an informed way

plaintiff[']s claim of fraud.'"   Id. (quoting Coffey v. Foamex L.P., 2 F.3d 157, 162 (6th Cir.

1993).   Then the court discussed the averments in the complaint and concluded that they

provided "a general framework for relevant discovery and are sufficient to alert the

defendants to the particulars of their alleged misconduct.   Id. at 781.   For the reasons

stated above, the SAC is too ambiguous for Defendants to answer "in an informed way,"

and certainly does not "alert [them] to the particulars of their alleged misconduct."

Plaintiffs quote from Falat v. Cty. of Hunterdon, No. 12-6804 (SRC), 2013 U.S.

Dist. LEXIS 37398 (D.N.J. Mar. 19, 2013) as follows: "It may at times be appropriate and

convenient for a pleading to use the short-hand terms 'Defendants.'"   Id. at 12.   But, the

Plaintiffs take the language out of context and cite it in a misleading way.   The full

sentence reads: "It may at times be appropriate and convenient for a pleading to use the

short-hand terms 'Defendants,' but when the Complaint has named 16 separate

defendants (exclusive of fictiously named defendants) who occupied different positions

and presumably had distinct roles in the alleged misconduct, Plaintiffs cannot merely

state that 'Defendants did x'–they must specifically allege which Defendants engaged in

what wrongful conduct."   Id.   The Falat court dismissed the claims because the plaintiffs

relied on impermissible group pleading.

In Whalen v. Stryker Corp., 783 F. Supp. 2d 977 (E.D. Ky. 2011), the court said the

pleading requirements of FED. R. CIV. P. 9(b) should be applied less stringently where the

alleged fraud occurred over a long period of time, consisted of numerous acts, there had

been no discovery, and the information was within the knowledge and control of the

defendant.   The court said the complaint was sufficiently detailed in that it included the

parties and participants in the alleged fraud, the representations made, why the

representations were misleading or false, the fraudulent scheme, the defendants'

fraudulent intent, reliance on the fraud, and the resulting injury.   This decision is of no help to Plaintiffs because it does not include the averments of the complaint, or a summary of the averments in order to compare them to the SAC.

Plaintiffs also rely on Corr. Med. Care, Inc. v. Gray, No. 07-2840, 2008 U.S. Dist. LEXIS 6596 (E.D. Pa. Jan. 30, 2008), where the court said "the 'group pleading' in this case does not concern the court because the complaint alleges conspiracy or agency theory and because the court was able to identify the relevant plaintiffs and defendants for each claim."   Id. at 33.   The opposite is true for the SAC.

Lastly, Plaintiffs cite EEOC v. Gargiulo, Inc., No. 2:05-cv-460-Ftm-29SPC, 2006 U.S. Dist. LEXIS 23927 (M.D. Fla. Mar. 22, 2006), which they say, stands for the proposition that group pleading is permissible where, as here, each Defendant has engaged in identical activities (Doc. 158 at 4).   The Gargiulo court dismissed with leave to amend and in the process said "plaintiff cannot simply lump its individual assertions together in a group pleading, unless it is plaintiff's contention that the identical events apply to all five individuals."   Id. at 7.   Here, Plaintiffs' reliance on group pleading renders their averments implausible.   The SAC also runs afoul of Indiana law which defines tortious interference with a business relationship in terms of specific, individual relationships between a plaintiff and third party in which the defendant interferes. Economation, Inc., 694 F. Supp. at 556.

For these reasons, I find that the SAC fails to state a cause of action for tortious interference with business relations against any Defendant.   I also find that Plaintiffs have had a sufficient opportunity to discover and allege their claims of tortious interference against Defendants.   Therefore, I respectfully recommend that the dismissal be with prejudice.

Count IV: Quantum Meruit

Indiana recognizes a cause of action based upon a constructive contract, also known as quantum meruit.   Bayh v. Sonnenburg, 573 N.E.2d 398, 408 (Ind. 1991) ("Plaintiffs' sole common law claim is unjust enrichment, also referred to as quantum meruit, contract implied-in-law, constructive contract, or quasi contract."); Coleman v. Coleman, 949 N.E.2d 860, 866 (Ind. App. 2011) ("In Indiana, unjust enrichment is a label given to so-called 'constructive contracts,' which are not actually contracts at all; such 'contracts' are also called quantum meruit, contracts implied-in-law, or quasi contracts.").

The elements of a cause of action for quantum meruit under Indiana law are "(1) a benefit conferred upon another at the express or implied request of this other party; (2) allowing the other party to retain the benefit without restitution would be unjust; and (3) the plaintiff expected payment."   Woodruff v. Ind. Family & Soc. Servs. Admin., 964 N.E.2d 784, 791 (Ind. 2012).   In cases where the plaintiff cannot prove the defendant expressly or impliedly requested the benefit, the first element can be satisfied by a showing "that provision of the benefit was necessary to protect the interests of the defendant or another."   Coleman, 949 N.E.2d at 868.

The Court dismissed the quantum meruit count from the amended complaint in part because Plaintiffs alleged that they entered into contracts with Defendants.   The Court found that the contracts precluded Plaintiffs' equitable claim based on a contract implied in law[4]  (Docs. 145, pp. 6-7; 150, p. 2).   The SAC alleges that no Plaintiff has a binding contract with any Defendant, the DRPs offer no consideration to the Plaintiffs, and

---

[4] "Indiana appellate courts have uniformly held that 'the existence of a valid express contract for services ... precludes implication of a contract covering the same subject matter.   The rights of the parties are controlled by the contract and under such circumstances recovery cannot be had on the theory of quantum meruit.'"   Indus. Dredging & Eng'g Corp. v. S. Ind. Gas & Elec. Co., 840 F.2d 523, 525 (7th Cir. 1988) (quoting Kincaid v. Lazar, 405 N.E.2d 615, 619 (Ind. App. 1980)) (alterations in original).

they do not assert any claim on the DRPs or the violation of any DRP term (Doc. 158, p.

42).

The Court also dismissed the quantum meruit count because Plaintiffs' expectation

of payment was unreasonable. The Court explained

> But the sums at issue in the Plaintiffs' quantum meruit claims
> are not the amounts that they have already received from the
> Defendants.   Rather, their quantum meruit claim is limited to
> any sums that, in fairness, they should have been paid, but
> were not.   It is not enough for the Plaintiffs to demonstrate
> that they expected *some* payment, because they received
> *some* payment.   They must demonstrate that they expected
> more.
>
> As to this expectation of "more," the Plaintiffs fail to respond to
> the case law, cited by Judge Smith, requiring that the
> expectation of payment be reasonable.   See Woodruff v.
> Indiana Family and Social Services Admin., 964 N.E.2d 784,
> 792 (Ind. 2012) (affirming judgment on quantum meruit claim
> because plaintiff "could not, under any level of
> reasonableness, have expected payment").   Accepting as
> true the facts alleged here by the Plaintiffs – essentially that
> they agreed to perform repairs at certain prices, and that they
> knew that the Defendants had always refused to pay more
> than those prices – the Plaintiffs could not, under any level of
> reasonableness, have expected to be paid more than what
> they received.

(Doc. 150 at 2).

The SAC alleges that Defendants have imposed a fixed price structure that does

not fully compensate Plaintiffs for the services they provide (Doc. 151, ¶¶ 139, 147, 154,

157-161, 169).   When it comes to payment, Plaintiffs state that Defendants position is

"take it or leave it."   (Id. at ¶ 160).   Plaintiffs argue that these averments are not fatal to

their claim because: "The elements of quantum meruit do not include a requirement that

Defendants' determination of whether the amount of payment was reasonable by their

own determination.   The reasonableness of compensation is ultimately a question of

fact."   (Doc. 158 at 43) (emphasis in original).   Plaintiffs seemingly fail to understand

that the determination of reasonable compensation only becomes an issue for the trier of

fact after Plaintiffs satisfy the three requirements to establish a quantum meruit claim.

Plaintiffs cannot credibly allege that they expected additional payment after averring that

Defendants fixed prices and told Plaintiffs to "take it or leave it."   Under Indiana law,

someone who provides work without a reasonable expectation of payment simply cannot

recover in quantum meruit.   Lauderdale Cty. Sch. Dist., 24 F.3d 671, 696-97 (5th Cir.

1994) ("Quitman has refused to pay money since 1968, and it repudiated the entire

agreement in 1977.   Under these circumstances,  Enterprise did not have a reasonable

expectation of compensation, and therefore it should not recover on a theory of quantum

meruit."); City of Calhoun v. N. Ga. Elec. Membership Corp., 443 S.E.2d 469, 472 (Ga.

1994) (holding that plaintiff city "never had a reasonable expectation that" defendant would

make franchise payments, where defendant "unequivocally apprised" city that it would not

pay); Blue Ash Auto Body, Inc. v. Progressive Cas. Ins. Co., 2011-Ohio-5785, at ¶ 12,

2011 WL 5444201, at *3 (Ohio App. Nov. 10, 2011) (auto body shops could not

demonstrate that any enrichment of insurance  company was unjust, where shops entered

into agreements with insureds knowing in  advance insurance company's estimates for the

work and were free to refuse to do the work).

The Court also dismissed the quantum meruit count in the amended complaint

because Plaintiffs failed to allege that they conferred a benefit on Defendants (Doc. 150, p. 3).

Indiana courts have cited the Restatement (First) of Restitution § 1 when evaluating

quantum meruit claims.   Bayh, 573 N.E.2d at 408.   The Restatement defines a "benefit"

as

> b. *What constitutes a benefit*.   A person confers a benefit
> upon another if he gives to the other possession of or some
> other interest in money, land, chattels, or choses in action,
> performs services beneficial to or at the request of the other,
> satisfies a debt or a duty of the other, or in any way adds to
> the other's security or advantage.   He confers a benefit not
> only where he adds to the property of another, but also where
> he saves the other from expense or loss. The word "benefit,"
> therefore, denotes any form of advantage.   The advantage for
> which a person ordinarily must pay is pecuniary advantage; it
> is not, however, necessarily so limited, as where a physician
> attends an insensible person who is saved subsequent pain or
> who receives thereby a greater chance of living.

Restatement (First) of Restitution § 1 cmt. b (1937).   According to Plaintiffs, "Defendants

are under compulsion to satisfy their legal obligation to pay for repairs to the vehicles of

their respective claimants and insureds.   Plaintiffs' rendering of service to the

Defendants' claimants and insureds permits and enables Defendants to execute and fulfil

that obligation thus rendering a benefit upon the Defendants."   (Doc. 158 at 44).   In A&E

Auto Body, Inc. v. 21st Century Centennial Ins. Co., No. 6:14-cv-310-Orl-31TBS, 2015 WL

304048, at *5 (M.D. Fla. Jan. 21, 2015), the Court said:

> The efforts to state a claim in Counts I and II fail because the
> Plaintiffs have not conferred a benefit upon the Defendants.
> The Plaintiffs point to the repairs they performed, asserting
> that they "benefitted Defendants and Defendant's
> insured/claimants for whom Defendants are required to
> provide payment for repairs."   (Amended Complaint at 43).
> However, the Amended Complaint provides no support for this
> assertion.   The repairs at issue obviously provided a benefit
> to the owners of the vehicles.   But so far as the Amended
> Complaint discloses, the only effect of such a repair on the
> insurance company is the incurring of an obligation to pay for
> it.   *Cf.* Adventist Health System/Sunbelt, Inc. v. Medical Sav.
> Ins. Co., 2004 WL 6225293 at *6 (M.D. Fla. Mar. 8, 2004)
> (Fawsett, J.) (in unjust enrichment case, stating that "a third
> party providing services to an insured confers nothing on the
> insurer except a ripe claim for reimbursement," and citing
> cases).

This reasoning applies here.   The SAC alleges that "Defendants are required to provide payment for repairs" and that performing repairs "benefitted Defendants and Defendant's insured/claimants."   (Doc. 151, ¶ 489).   The SAC does not allege that repairs are done at Defendants' request, that Defendants have a duty to repair the vehicles, or that repairing vehicles saves Defendants from expense or loss.   According to the SAC, the only effect a repair has on Defendants is the incurring of an obligation to pay for it.   The obligation to pay is not a benefit to Defendants.

Finally, the quantum meruit count is a group pleading.   It does not include the information necessary to inform Defendants about the repairs for which additional compensation is sought, or the identity of the Plaintiffs associated with those repairs. Without this information, Defendants cannot respond to the SAC in an informed way.

Because I see no realistic way for Plaintiffs to overcome these impediments to their quantum meruit claims, I respectfully recommend that this count be dismissed with prejudice.

## IV. Recommendation

Upon consideration of the foregoing, I **RESPECTFULLY RECOMMEND** that Plaintiffs' state law claims be dismissed with prejudice.

## V. Notice to Parties

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.   A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.   See 11th Cir. R. 3-1.

**RESPECTFULLY RECOMMENDED** at Orlando, Florida on February 26, 2016.

THOMAS B. SMITH
United States Magistrate Judge

Copies furnished to:

Presiding United States District Judge
Counsel of Record